# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GNC HOLDINGS, INC., *et al.*, | ) | Case No. 20-11662 (KBO) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | **Bid Procedures Hearing Date:** |
| | ) | **July 22, 2020 at 1:00 p.m. (ET)** |
| | ) | |
| | ) | **Bid Procedures Objection Deadline:** |
| | ) | **July 15, 2020 at 4:00 p.m. (ET)** |
| | ) | |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING (I)(A) THE DEBTORS' ENTRY INTO STALKING HORSE AGREEMENT AND RELATED BID PROTECTIONS; (B) THE BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (C) THE PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) THE FORM AND MANNER OF NOTICE OF THE SALE HEARING, ASSUMPTION PROCEDURES, AND AUCTION RESULTS, AND (E) DATES FOR AN AUCTION AND SALE HEARING, (II)(A) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, LIABILITIES, RIGHTS, INTERESTS AND ENCUMBRANCES, AND (B) THE DEBTORS' ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) RELATED RELIEF AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "***Debtors***")

respectfully state as follows in support of this motion (the "***Motion***"):

---

[1]   The debtors in these Chapter 11 Cases, along with the last four digits of each debtor's United States federal tax identification number, if applicable, or other applicable identification number, are: GNC Holdings, Inc. (6244); GNC Parent LLC (7572); GNC Corporation (5170); General Nutrition Centers, Inc. (5168); General Nutrition Corporation (4574); General Nutrition Investment Company (3878); Lucky Oldco Corporation (7141); GNC Funding, Inc. (7837); GNC International Holdings, Inc. (9873); GNC China Holdco, LLC (0004); GNC Headquarters LLC (7550); Gustine Sixth Avenue Associates, Ltd. (0731); GNC Canada Holdings, Inc. (3879); General Nutrition Centres Company (0939); GNC Government Services, LLC (2295); GNC Puerto Rico Holdings, Inc. (4559); and GNC Puerto Rico, LLC (7234). The debtors' mailing address is 300 Sixth Avenue, Pittsburgh, Pennsylvania 15222.

## RELIEF REQUESTED

1.      The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "***Bidding Procedures Order***") (a) authorizing the Debtors to enter into and perform under an asset purchase agreement (the "***Stalking Horse Agreement***") between the Debtors and Harbin Pharmaceutical Group Holding Co., Ltd. (or its designee) (the "***Stalking Horse Bidder***" or the "***Buyer***"),[2] subject to the solicitation of higher or otherwise better offers for the Debtors' assets (the "***Assets***"); (b) approving the Bid Protections (defined below) granted to the Stalking Horse Bidder; (c) approving the proposed bidding procedures attached as **Exhibit 1** to the Bidding Procedures Order (the "***Bidding Procedures***"); (d) approving procedures for assuming and assigning executory contracts and unexpired leases and certain related notices, including notice of proposed cure amounts; (e) approving the form and manner of (1) notice of the Auction (defined below) and Sale Hearing (the "***Sale Notice***"), attached as **Exhibit 2** to the Bidding Procedures Order; (2) notice of the Assumption Procedures (the "***Assumption Notice***"), attached as **Exhibit 3** to the Bidding Procedures Order; and (3) the post-auction notice ("***Post-Auction Notice***"), attached as **Exhibit 4** to the Bidding Procedures Order;  (f) establishing dates and deadlines in connection with the sale of substantially all of the Debtors' Assets (the "***Sale***"), including the Bid Deadline (as defined in the Bidding Procedures), and the dates of the auction for the Assets (the "***Auction***"), if needed, and the hearing with respect to the approval of the sale (the "***Sale Hearing***"); and (g) granting related relief.

---

[2]      The term sheet for the Stalking Horse Agreement is attached hereto as **Exhibit B** (the "***Term Sheet***").  The Debtors will file the Stalking Horse Agreement in advance of the hearing on this Motion.  The Debtors anticipate filing the Stalking Horse Agreement on or before July 7, 2020 or such other deadline as the Debtors and the Stalking Horse Bidder agree but in no event shall that be later than July 15, 2020.  To the extent the Stalking Horse Agreement is filed after July 7, 2020, the Debtors will extend the objection deadline for parties to object to the Bidding Procedures, as appropriate.

2.    The Debtors request that the Bidding Procedures Order establish the following dates and deadlines, subject to extension and other modifications by the Debtors:

(i)    **Bid Deadline**:  August 28, 2020 at 4:00 p.m. (prevailing Eastern Time), as the deadline by which all Qualified Bids must be actually received pursuant to the Bidding Procedures (the "***Bid Deadline***");

(ii)    **Sale Objection Deadline**:  August 21, 2020 at 4:00 p.m. (prevailing Eastern Time) as the deadline (the "***Sale Objection Deadline***") to (i) object to the Sale and/or (ii) except as otherwise set forth in the Assumption Procedures (defined below), object to the potential assumption or assumption and assignment of the Debtors' executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code (all such contracts and leases capable of being assumed or assumed and assigned under section 365 of the Bankruptcy Code, the "***Assigned Contracts***") and cure amounts related thereto, *provided* that, notwithstanding the foregoing, any (x) objections to the conduct of the Auction or designation of the Successful Bid or Back-Up Bid, or (y) Adequate Assurance Objections (defined below) may be filed at least 24 hours prior to the Sale Hearing;

(iii)    **Auction**:  September 1, 2020 at 10:00 a.m. (prevailing Eastern Time), as the date and time of the Auction, if one becomes necessary, which will be held at the offices of the proposed counsel for the Debtors, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611, telephonically, or by video via Zoom, or such later time or other place as the Debtors will timely notify all other Qualified Bidders, in consultation with the Consultation Parties (defined below);

(iv)    **Reply Deadline**:  September 2, 2020 at 5:00 p.m., (prevailing Eastern Time), as the deadline for the Debtors to file replies to any objections to the Sale and/or the assumption or assumption and assignment of the Assigned Contracts and cure amounts related thereto, other than with respect to objections filed after the Sale Objection Deadline;

(v)    **Auction Objection Deadline**: September 3, 2020, at 4:00 p.m., prevailing Eastern Time, as the deadline to object to the conduct of the Auction, the choice of Successful Bidder and/or Back-Up Bidder and Adequate Assurance Objections (as defined below) with respect to a Successful Bidder and/or Back-Up Bidder other than the Stalking Horse Bidder; and

(vi)    **Sale Hearing**:  Subject to the Court's availability, September 4, 2020, before the Honorable Karen B. Owens, Bankruptcy Judge, United States Bankruptcy Court for the District of Delaware, at District of Delaware, at

824 Market Street North, 6th Floor, Wilmington, Delaware 19801, or pursuant to the Court's video hearing procedures.

3.      In addition, by this Motion, the Debtors seek, following the conclusion of the Sale Hearing, entry of an order (the "***Sale Order***"), the form of which will be filed on the docket of these Chapter 11 Cases (defined below) no later than July 31, 2020: (a) authorizing (1) the sale (if any) of the Assets free and clear of all claims, liens, liabilities, rights, interests and encumbrances and (2) the assumption and assignment of certain executory contracts and unexpired leases; and (b) granting related relief.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and, under Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the relief requested herein are sections 105, 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***"), rule 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Local Rules 2002-1, 6004-1 and 9006-1.

## BACKGROUND

5.      On June 23, 2020 (the "*Petition Date*"), the Debtors filed voluntary petitions for relief in this Court, commencing cases (the "*Chapter 11 Cases*") under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been requested in the Chapter 11 Cases, and no committees have been appointed.

6.      The Debtors commenced an ancillary proceeding under Part IV of the Companies' Creditors Arrangement Act (Canada) in Toronto, Ontario, Canada before the Ontario Superior Court of Justice (Commercial List).

7.      The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of these Chapter 11 Cases, is set forth in detail in the *Declaration of Tricia Tolivar, Chief Financial Officer of GNC Holdings, Inc. in Support of Chapter 11 Petitions and First Day Pleadings* (the "*First Day Declaration*") [Docket No. 21].[3]

## INTRODUCTION

8.      The Debtors commenced these Chapter 11 Cases with a restructuring support agreement (the "*RSA*")[4] that allows them to pursue a "dual track" restructuring strategy designed to maximize the value of their estates.  Having agreed with their key creditor constituencies on the principal terms of a standalone plan of reorganization[5] that enjoys broad-based support, as

---

[3]    The First Day Declaration and other relevant case information is available from (a) the Court's website, www.deb.uscourts.gov, and (b) the website maintained by the Debtors' proposed claims and noticing agent, Prime Clerk LLC, at https://cases.primeclerk.com/gnc.

[4]    The RSA is attached as Exhibit B to the First Day Declaration.

[5]    The Debtors anticipate filing a plan of reorganization no later than July 15, 2020 (the "*Plan*").

reflected in the Debtors' RSA, the Debtors are also pursuing a competitive sale process for their assets as permitted by the RSA. The relief requested in this Motion is essential to ensure that the process is as competitive and robust as possible, and that the Debtors receive top dollar for their assets to the extent they ultimately decide to consummate an asset sale rather than the Standalone Plan Transaction (as defined in the First Day Declaration).

9.     The $760 million going-concern bid submitted by the Stalking Horse Bidder will serve the critical function of setting a "floor" for further competitive bidding. As noted above and as set forth in the Term Sheet, the Debtors have agreed to a deal in principle with the Stalking Horse Bidder. The transaction is subject to definitive documentation, including the Stalking Horse Agreement (the "***Definitive Documentation***"). The Debtors anticipate filing the Stalking Horse Agreement on or before July 7, 2020 or such other deadline as the Debtors and the Stalking Horse Bidder agree but in no event shall that be later than July 15, 2020. To the extent the Stalking Horse Agreement is filed after July 7, 2020, the Debtors will extend the objection deadline for parties to object to the Bidding Procedures, as appropriate. The RSA requires that the Debtors obtain the consent of the Required Sale Consenting Parties (as defined in the RSA) to proceed with a sale of their assets in lieu of the Standalone Plan Transaction and, although they do not yet have such consent, the Debtors anticipate that they will have such consent once the Definitive Documentation is finalized.

10.     The terms of the Stalking Horse Bid—including the Bid Protections the Debtors seek authority to provide by this Motion—are reasonable and were the product of good faith, arm's length negotiations among the Debtors, the Stalking Horse Bidder, and certain of the creditor parties to the RSA, during the period leading up to the Petition Date. The Stalking Horse Bid (and

any overbids) represent an enticing alternative to the Standalone Plan Transaction and a "market check" on the terms of the Standalone Plan Transaction.

11.     The anticipated 60-day timeline for the bidding process ensures that the assets will be comprehensively marketed without unduly delaying the progress of these cases.  The process contemplated by the Bidding Procedures will leave no doubt that, at the conclusion of that process, the Debtors will have explored all available alternatives and identified the highest or otherwise best offer for their assets.

12.     The Debtors and certain of the other parties to the RSA believe that approval of the Stalking Horse Agreement (as contemplated by the Term Sheet) and related Bid Protections, as well as the Bidding Procedures, will set these cases on a positive trajectory and are essential to the Debtors' ability to identify and consummate the sale or restructuring transaction offering the greatest value to their creditors.  Accordingly, the Debtors respectfully submit that the Court should grant the relief requested herein.

### THE PROPOSED SALE AND BIDDING PROCEDURES

### I.    SUMMARY OF KEY TERMS OF THE STALKING HORSE BID

13.     By this Motion, the Debtors are requesting approval of the designation of the Stalking Horse Bidder and Stalking Horse Bid on the terms provided in the Term Sheet, as well as approval of reasonable and customary Bid Protections.  Specifically, the Bid Protections consist of a break-up fee equal to $22.8 million and an expense reimbursement of up to $3.0 million of reasonable and documented out of pocket fees, each of which would constitute a superpriority administrative expense in the Debtors' cases subordinate only to the Carve-Out, the DIP Superpriority Claims and the 507(b) Claims (each as defined in the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting*

*Adequate Protection to Prepetition Secured Lenders, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing and (VII) Granting Related Relief* entered on June 26, 2020 [Docket No. 134]) and be payable from the proceeds of a Sale to a higher or better bidder (if any), in the event that the Stalking Horse Bid is not selected as the winning bidder.  Given the Debtors' need to maximize the value of the Assets through a timely and efficient marketing and sale process, the ability to designate a Stalking Horse Bid and offer Bid Protections is justified, appropriate and essential.

14.      In accordance with Local Rule 6004-1(b), the pertinent terms of the Term Sheet are summarized in the following table.[6] The Debtors respectfully submit that all terms of the Term Sheet and eventual Stalking Horse Agreement, including those required to be highlighted under Local Rule 6004-1(b) are fair, reasonable, and appropriate under the circumstances, in light of the parties' good faith, arm's-length negotiation of the Stalking Horse Bid, the support of the Debtors' key creditor constituencies for the Debtors' entry into such agreement, and the substantial benefits the Debtors and their estates will realize as a result thereof, including the establishment of a baseline price for the Debtors' assets.

| TERM SHEET | |
|---|---|
| **Parties** | <u>Seller</u>:  GNC Holdings, Inc. and each of its subsidiaries (which includes all of the Debtors).<br><br><u>Buyer</u>:  Harbin Pharmaceutical Group Holding Co., Ltd. or its designee.<br><br>*See* Term Sheet, Preamble |
| **Purchase Price** | The aggregate consideration for all or substantially all of the assets of the Company will be $760 million, which amount shall be inclusive of the full amount of:[7]<br><br>(i) the BOC Facility; |

---

[6]    This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Term Sheet, the latter governs in all respects.  Capitalized terms used but not otherwise defined in this summary shall have the meanings set forth in the Term Sheet.

[7]    The below may be adjusted if the Debtors do not proceed with the DIP Financing or if it is not approved by the Court.

| TERM SHEET | |
|---|---|
| | (ii) the Second Lien Take-Back Instrument; |
| | (iii) the DIP Financing; |
| | (iv) draw of a revolver up to $75 million; |
| | (v) the assumption of certain liabilities, including, without limitation, cure costs. |
| | Which amounts shall be subject to adjustments to take proper account of the agreed upon DIP budget (including an allowance for permitted variances). |
| | *See* Term Sheet, Art. I. |
| **Purchased Assets** | The assets shall include all or substantially all of the Company's assets. *See* Term Sheet, Art. I. |
| **Closing Conditions** | The obligations of the parties to effect the Sale shall be subject to the satisfaction of the conditions precedent as set forth in the Definitive Documents. Such conditions precedent shall be usual and customary for transactions of this type, including, but not limited to, that the Court shall have entered an order approving the Sale or confirming a chapter 11 plan and such order shall not have been stayed or modified or subject to appeal. *See* Term Sheet, Art. I. |
| **"Insider" Status of Stalking Horse Bidder** Local Rule 6004-1(b)(iv)(A) | The Buyer is an affiliate of Harbin Pharmaceutical Group Co., Ltd. ("***Harbin***"), which holds approximately 41% of the voting interests in Debtor GNC Holdings, Inc., and is therefore an "insider" as defined in section 101 of the Bankruptcy Code. Harbin also has other relationships with the Debtors (including as a joint venture partner) as described in greater detail in the First Day Declaration.<br><br>To ensure the fairness of the Debtors' contemplated auction process and any sale to Harbin, consideration of a potential transaction with Harbin, including the Stalking Horse Bid, was previously delegated to the special committee of independent directors of the board of GNC Holdings, Inc. and no Harbin-affiliated directors or officers of the Debtors were involved in the negotiation or approval by GNC Holdings, Inc. of the Stalking Horse Bid. |
| **Agreements with Management or Key Employees** Local Rule 6004-1(b)(iv)(B) | The Stalking Horse Bidder has not entered into any agreements with management or key employees concerning compensation or future employment. |
| **Private Sale/No Competitive Bidding** Local Rule 6004-1(b)(iv)(D) | The Term Sheet contemplates that the Sale shall be implemented pursuant to a bid and auction process or in connection with confirmation of a chapter 11 plan. *See* Term Sheet, Art. I. |
| **Closing and Other Deadlines** Local Rule 6004-1(b)(iv)(E) | The Term Sheet does not provide a deadline for closing, but the Bidding Procedures set a deadline for closing of September 21, 2020. |
| **Tax Exemption** Local Rule 6004-1(b)(iv)(I) | The Buyer and the Debtors do not seek to have the sale of the Assets in the Stalking Horse Bid declared exempt from taxes under section 1146(a) of the Bankruptcy Code. |
| **Requested Findings as to Successor Liability** Local Rule 6004-1(b)(iv)(L) | The Debtors expect the proposed Sale Order to include a customary finding concerning the absence of successor liability for the Buyer. |

| TERM SHEET | |
|---|---|
| **Credit Bid**<br>Local Rule 6004-1(b)(iv)(N) | The Term Sheet seeks to permit the Buyer to credit bid DIP claims pursuant to section 363(k) of the Bankruptcy Code. In addition, the Bidding Procedures generally permit credit bidding subject to certain conditions, as described in greater detail below. *See* Term Sheet, Art. IV; Bidding Procedures, Section G. |
| **Relief from Bankruptcy Rule 6004(h)**<br>Local Rule 6004-1(b)(iv)(O) | The Debtors are seeking a waiver of the Bankruptcy Rule 6004(h) stay in connection with the Bidding Procedures Order. *See* Proposed Bidding Procedures Order, ¶ 32. |

## II.    THE BIDDING PROCEDURES

15.    The Bidding Procedures are designed to facilitate a fair, robust and competitive sale process to ensure that the value of the Assets is maximized. The Bidding Procedures allow the Debtors to solicit and evaluate bids from potential bidders and determine the highest or otherwise best offer for their Assets on a timeline that is consistent with the timeline for these Chapter 11 Cases set forth in the RSA. Specifically, the Bidding Procedures would provide 60 days between the filing of this Motion and the Final Bid Deadline, which the Debtors believe will be sufficient to allow potential bidders to conduct diligence and formulate competing bids. As of the date hereof, the Debtors have commenced the marketing process and have already made contact with numerous parties that may have interest in submitting a bid.

16.    Pursuant to Local Rule 6004-1(c), certain of the key terms of the Bidding Procedures are highlighted in the chart below:[8]

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **Provisions Governing Qualification of Bidders and Qualified Bids**<br>Local Rule 6004-1(c)(i)(A)-(B) | A. **Bid Deadline** – the Bid Deadline to submit a binding and irrevocable offer to acquire the Assets is **August 28, 2020 at 4:00 p.m. prevailing Eastern time (Bid Procedures, Section C)**.<br><br>B. **Diligence Access Requirements** – To access the Debtors' data room and participate in the sale process, a Potential Bidder must submit:<br><br>• a confidentiality agreement on customary terms that are reasonably acceptable to |

---

[8]    This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Bidding Procedures, the Bidding Procedures govern in all respects. Capitalized terms used but not otherwise defined in this summary shall have the meanings set forth in the Bidding Procedures.

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
| --- |

<table>
<tr><td></td><td>

the Debtors;

- sufficient evidence, as reasonably determined by the Debtors in consultation with the Consultation Parties, [9] that the bidder intends to obtain due diligence and participate in the sale process for a bona fide purpose consistent with the Bidding Procedures; and

- evidence of such Potential Bidder's financial capability to acquire the Assets, the adequacy of which will be assessed by the Debtors (with the assistance of their advisors). **(Bid Procedures, Section B)**

C. **Qualified Bid Requirements -** To be eligible to participate in the Auction, a Potential Bidder must deliver to the Debtors and their advisors, a written, irrevocable offer that must be determined by the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, to satisfy each of the following conditions (collectively, the "***Bid Requirements***"):

- **Purpose.** Each Potential Bidder must state that the Bid includes an offer by the Potential Bidder to purchase some or all of the Assets, and identify the Assets with reasonable specificity and the particular liabilities, if any, the Potential Bidder seeks to assume.

- **Purchase Price.** Each Bid must clearly set forth the purchase price to be paid for the Assets (the "***Purchase Price***") and must (a) indicate the source of cash consideration, including funding commitments, and confirm that such consideration is not subject to any contingencies, and (b) identify separately the cash and non-cash components of the Purchase Price, which non-cash components shall be limited only to credit-bids and assumed liabilities. The Bid should include a detailed sources and uses schedule. The Purchase Price must include (i) an aggregate amount of cash sufficient to pay all DIP Facility Claims outstanding at the closing (or, if the holder of any such DIP Facility Claims so consents, such payment may be effected, in lieu of cash, by way of credit bid pursuant to section 363(k) of the Bankruptcy Code), (ii) (x) additional cash sufficient to pay in full all of the Allowed Tranche B-2 Term Loan Claims, or (y) to the extent the Required Lenders (as defined in the Tranche B-2 Term Loan Agreement) have agreed in their sole discretion on behalf of all Tranche B-2 Term Lenders, some other form of consideration (including, without limitation, any or a combination of cash and debt and/or equity securities, as determined by such Required Lenders in their sole discretion), (iii) the assumption or payment in cash of all Allowed Administrative Claims, all Allowed Tax Priority Claims, all Allowed Other Priority Claims, and all Allowed Other Secured Claims, (iv) the payment of all cure amounts and all other amounts required to effect the assumption and assignment of all applicable executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code, and (v) the assumption of

</td></tr>
</table>

---

[9] The "Consultation Parties" include: (i) counsel and financial advisors to the ad hoc group of holders of Tranche B-2 Obligations and FILO Term Loan Obligations represented by Milbank LLP (the "***Crossover Ad Hoc Group***"), (ii) counsel and financial advisors to the ad hoc group of holders of FILO Term Loan Obligations represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP (the "***FILO Ad Hoc Group***"), and (iii) counsel and financial advisors to any official committee of unsecured creditors appointed in the Bankruptcy Case (the "***UCC***"); provided, that notwithstanding anything to the contrary in the foregoing, no person or entity that constitutes a Stalking Horse Bidder, Potential Bidder, Acceptable Bidder, Qualified Bidder, Successful Bidder or Back-Up Bidder (as determined by the Debtors, in their reasonable discretion) shall be deemed a Consultation Party for so long as such person constitutes a Stalking Horse Bidder, Potential Bidder, Acceptable Bidder, Qualified Bidder, Successful Bidder or Back-Up Bidder.

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

certain liabilities (other than any assumed liabilities referenced in clause (i) above) (collectively, the "***Minimum Purchase Price***"). The Debtors' advisors will provide the dollar amount of these claims upon request.

- **Minimum Bid.** The value of each Bid for all or substantially all of the Debtors' Assets, as determined by the Debtors in their business judgment (in consultation with the Consultation Parties), must exceed (a) the Minimum Purchase Price, plus (b) the maximum amount of Bid Protections payable to the Stalking Horse Bidder under the Term Sheet (*i.e.*, $25.8 million)[10], plus (c) the minimum Bid increment of $5 million (or such other amount as the Debtors may determine in consultation with the Consultation Parties, which amount may be less than $5 million, including with respect to a Bid for less than all Assets). The Debtors and their advisors, in consultation with the Consultation Parties, will determine, in their reasonable business judgment, the value of any assumed liabilities that differ from those included in the Stalking Horse Bid.

    Each Bid seeking to acquire an individual asset or combination of assets that are less than all of the Debtors' Assets must have a value that in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, either independently or in conjunction with one or more other Bids, exceeds the value that would be realized for such individual asset or combination of assets pursuant to the Stalking Horse Bid.

- **Bid Deposit.** Each Bid must be accompanied by a cash deposit (made by wire transfer or certified or cashier's check) equal to 7.5% of the aggregate value of the cash and non-cash consideration of the Bid (the "***Good Faith Deposit***"), which will be held in a segregated account established by the Debtors in consultation with the Consultation Parties. To the extent a Qualified Bid is modified before, during, or after the Auction in any manner that increases the purchase price contemplated by such Qualified Bid, the Debtors reserve the right, in consultation with the Consultation Parties, to require that such Qualified Bidder increase its Good Faith Deposit so that it equals ten percent of the increased Purchase Price.

- **Committed Financing.** If a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the Sale transaction set forth in its Bid with cash on hand, each Bid must include committed financing documented to the Debtors' satisfaction, in consultation with the Consultation Parties, that demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations (including any assumed liabilities) under its Bid. Such funding commitments or other financing must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants, conditions and term and termination provisions acceptable to the Debtors, in consultation with the Consultation Parties.

- **Pro Forma Capital Structure.** Each Bid must include a description of the Bidder's pro forma capital structure.

- **Good Faith Offer.** Each Bid must constitute a good faith, bona fide offer to purchase the Assets set forth in such Bid.

- **Marked Agreement.** Each Bid must be accompanied by clean and duly

---

[10] The $25.8 million maximum is comprised of (i) a break-up fee equal to $22.8 million and (ii) reimbursement of the Stalking Horse Bidder's reasonable, documented expenses up to $3.0 million.

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
| --- |

executed transaction documents including, at a minimum, a draft purchase agreement, including the exhibits and schedules related thereto, and any related material documents integral to such Bid pursuant to which the Potential Bidder proposes to effectuate the Sale, along with redlines of such agreements marked to reflect any amendments and modifications from the Stalking Horse Agreement and any other applicable transaction documents relating to the Stalking Horse Bid, which amendments and modifications may not be inconsistent with these Bidding Procedures. Each such draft purchase agreement must provide for (i) payment in cash at closing of the Expense Reimbursement and the Break-Up Fee to the Stalking Horse Bidder, and (ii) a representation that the Potential Bidder will: (a) with respect to a sale of the U.S. Assets, make all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "*HSR Act*"), if applicable, and submit and pay the fees associated with all necessary filings under the HSR Act as soon as reasonably practicable; provided, however, that the timing and likelihood of receiving HSR Act approval will be a consideration in determining the highest or otherwise best Bid; or (b) with respect to a sale of the Canadian Assets, make all necessary filings under the (x) Competition Act (R.S.C., 1985, c. C-34, as amended (the "*Competition Act*"); and (y) Investment Canada Act, (R.S.C., 1985, c. 28 (1st Supp.)) (the "*ICA*"), if applicable, and submit and pay the fees associated with all necessary filings under the Competition Act as soon as reasonably practicable; provided, however, that the timing and likelihood of receiving Competition Act and ICA approval will be a consideration in determining the highest or otherwise best Bid. The documents contemplated by this Section C(viii) shall herein be referred to as the "Qualified Bid Documents."

- **Contracts and Leases; Employees.** Each Bid must identify an initial schedule, of each executory contract and unexpired lease to be assumed and assigned to the Potential Bidder in connection with the Sale. Each Bid must identify with specificity (i) the party responsible for satisfying cure amounts and other amounts that have accrued under assumed and assigned contracts and leases after the Petition Date and prior to Closing, including amounts that have accrued but not yet become due prior to the Closing, (ii) the Debtors' store leases to be assumed and assigned to the Potential Bidder; and (iii) which of the Debtors' employees or groups thereof will be offered employment with the Potential Bidder to the extent it is the Successful Bidder and Closing occurs. Each Bid must expressly assume the Debtors' Compensation and Benefits Programs (as defined in the Plan).

- **No Contingencies.** A Bid must contain a clear statement that it is not conditioned on any contingency, including, among others, on obtaining any of the following (a) financing, (b) shareholder, board of directors, or other approvals (including regulatory approvals), and/or (c) the outcome or completion of a due diligence review by the Potential Bidder.

- **Binding and Irrevocable.** A Potential Bidder's Bid must be irrevocable unless and until the Debtors accept a higher Bid and such Potential Bidder is not selected as the Back-Up Bidder (as defined herein). In the event a Bid is chosen as the Back-Up Bid (as defined below), it must remain irrevocable until the Debtors and the Successful Bidder consummate the Sale.

- **Joint Bids.** The Debtors will be authorized to approve joint Bids in their reasonable discretion, in consultation with the Consultation Parties, on a case-by-case basis.

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

- **Adequate Assurance Information.** Each Bid must be accompanied by sufficient and adequate financial and other information (the "*Adequate Assurance Information*") to demonstrate, to the reasonable satisfaction of the Debtors, in consultation with the Consultation Parties, that such Potential Bidder (a) has the financial wherewithal and ability to consummate the acquisition of the Assets covered by the Bid (the "*Closing*"), and (b) can provide adequate assurance of future performance in satisfaction of the requirements under section 365(f)(2)(B) of the Bankruptcy Code, and the Potential Bidder's willingness to perform, under any contracts that are proposed to be assumed and assigned to such party. Such information, solely with respect to real estate leases, should include: (i) the exact name of the entity that will be designated as the proposed assignee of the leases; (ii) audited or, if not available, non-audited financial statements and any supplemental schedules for the calendar years ended 2018 and 2019 for the proposed assignee and any proposed guarantor; (iii) any documents regarding the proposed assignee's and any guarantor's experience in operating retail stores; (iv) the number of retail stores the proposed assignee and any guarantor operates and the trade names used; and (v) any additional evidence of the assignee's financial wherewithal, including available cash and any debt or equity commitments or other forms of liquidity post-closing. Such evidence may also include audited and unaudited financial statements, tax returns, bank account statements, a description of the proposed business to be conducted at the premises and/or any other documentation that the Debtors further request. The Bid must also identify a contact person that parties may contact to obtain additional Adequate Assurance Information.

- **Identity.** Each Bid must fully disclose the identity of each entity that will be participating in connection with such Bid (including any equity owners or sponsors, if the purchaser is an entity formed for the purpose of consummating the acquisition of the Assets), and the complete terms of any such participation, along with sufficient evidence that the Potential Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties. A Bid must also fully disclose any connections or agreements with the Debtors, any known, potential, prospective bidder, or Qualified Bidder (as defined herein), or any officer, director, or equity security holder of the Debtors.

- **Authorization.** Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors and, if required, its shareholders (or a comparable governing body reasonably acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

- **No Fees.** Except as otherwise provided in the Stalking Horse Agreement with respect to the Stalking Horse Bid: (a) each Potential Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed transaction; (b) by submitting its Bid, each Potential Bidder agrees to waive its right to request or receive fees or reimbursement of expenses on any basis, including under section 503(b) of the Bankruptcy Code; and (c) each Bid must expressly state that the Bid does not entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement.

- **Adherence to Bidding Procedures.** By submitting its Bid, each Potential Bidder is agreeing to (a) abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction and (b) serve as Back-Up Bidder, if its Bid is selected

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

|  | as the next highest or next best bid after the Successful Bid with respect to the applicable assets. |
|  | • **Regulatory Approvals and Covenants.** A Bid must set forth each regulatory and third-party approval required for the Potential Bidder to consummate the applicable Sale, if any, and the time period within which the Potential Bidder expects to receive such governmental, licensing, regulatory, or third-party approvals (and in the case that receipt of any such approval is expected to take more than thirty days following execution and delivery of the asset purchase agreement, those actions the Potential Bidder will take to ensure receipt of such approvals as promptly as possible). |
|  | • **As-Is, Where-Is.** Each Bid must include a written acknowledgement and representation that the Potential Bidder (a) has had an opportunity to conduct any and all due diligence regarding the Debtors' Assets and liabilities prior to making its Bid, (b) has relied solely upon its own or its advisors' independent review, investigation, and/or inspection of any documents and/or the Assets and liabilities in making its Bid, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, liabilities, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Potential Bidder's proposed purchase agreement for the Assets. |
|  | • **Time Frame for Closing.** A Bid by a Potential Bidder must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid (as defined herein), within a time frame reasonably acceptable to the Debtors in consultation with the Consultation Parties. |
|  | • **Consent to Jurisdiction.** The Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Plan, the Sale documents, and the Closing, as applicable. |
|  | Bids fulfilling all of the preceding requirements, as determined by the Debtors and their advisors, in their reasonable business judgment and in consultation with the Consultation Parties, will be deemed to be "***Qualified Bids***," and those parties submitting Qualified Bids will be deemed to be "***Qualified Bidders***." All information disclosed by any Potential Bidder in connection with all of the preceding requirements will be made available by the Debtors to the Consultation Parties promptly upon the Debtors' receipt thereof but in any event no later than the earlier of one business day or two calendar days following the Debtors' receipt of such information; *provided* that the Debtors shall provide the Stalking Horse Bidder with the number of Qualified Bids received and the amount of each respective Qualified Bid; *provided* that any confidential financing and/or equity commitment documents received from a Potential Bidder shall only be shared with the Consultation Parties on a professional-eyes'-only basis. The Debtors reserve the right, in consultation with the Consultation Parties, to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid |
|  | In addition, the Debtors, with the consent of the Consultation Parties, reserve the right to waive any of the Qualified Bid requirements set forth above and deem a Bid to be a Qualified Bid notwithstanding any non-compliance with such requirements. (**Bid Procedures, Section C**) |

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder** Local Rule 6004-1(c)(i)(C) | The Stalking Horse Bid provides for payment of a break-up fee equal to $22.8 million (i.e., 3% of the Purchase Price) and an expense reimbursement not exceeding $3,000,000. |
| **Modification of Bidding and Auction Procedures** Local Rule 6004-1(c)(i)(D) | • The Debtors, with the consent of the Consultation Parties, reserve the right to waive any of the Qualified Bid requirements set forth above and deem a Bid to be a Qualified Bid notwithstanding any non-compliance with such requirements. **(Bid Procedures, Section C)** <br><br> • The Debtors reserve the right, in consultation with the Consultation Parties, to alter the $5 million overbid increment under the Bidding Procedures. **(Bid Procedures, Section G(vi))** <br><br> • The Debtors reserve the right, in consultation with the Consultation Parties, to require the last and final Bids at the Auction to be submitted on a "blind" basis. **(Bid Procedures, Section G(x))** <br><br> • The Debtors reserve the right, in their reasonable business judgment and in consultation with the Consultation Parties, to adjourn the Auction one or more times. **(Bid Procedures, Section G(xi))** <br><br> • The Debtors reserve the right to announce additional/other Auction Procedures (besides those specifically set forth in the Bidding Procedures, after consultation with the Consultation Parties, from time to time on the record at the Auction. **(Bidding Procedures, Section G(xii))** <br><br> • The Debtors reserve the right, in consultation with the Consultation Parties, to continue the Sale Hearing to a later date. **(Bidding Procedures, Section I)** <br><br> • The Debtors reserve their rights, in consultation with the Consultation Parties, to modify the Bidding Procedures in good faith, to further the goal of attaining the highest or otherwise best offer for the Assets, or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Assets. The Debtors shall provide notice of any such modification to any Qualified Bidder, including the Stalking Horse Bidder. **(Bidding Procedures, Section L)** |
| **Closing with Alternative Back-Up Bidders** Local Rule 6004-1(c)(i)(E) | If for any reason the Successful Bidder or Successful Bidders fail to consummate the Qualified Bid or Qualified Bids within the time permitted after the entry of the Confirmation Order approving the Sale to the Successful Bidder or Successful Bidders, then the Qualified Bidder or Qualified Bidders with the next-highest or otherwise second-best Bid or Bids for the applicable Assets (each, a "***Back-Up Bidder***"), as determined by the Debtors after consultation with their advisors and the UCC advisors, at the conclusion of the Auction and announced at that time to all the Qualified Bidders participating therein, will automatically be deemed to have submitted the highest or otherwise best Bid or Bids (each, a "***Back-Up Bid***"), and the Debtors will be authorized, but not required, to consummate the transaction pursuant to the Back-Up Bid or Back-Up Bids as soon as commercially reasonably practicable without further order of the Bankruptcy Court upon at least 24 hours advance notice, which notice will be filed with the Bankruptcy Court. |

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | Upon designation of the Back-Up Bidder or Back-Up Bidders at the Auction, the Back-Up Bid or Back-Up Bids must remain open until the Closing of the Successful Bid or Successful Bids, as applicable. **(Bidding Procedures, Section J)** |
| **Provisions Governing the Auction** Local Rule 6004-1(c)(ii) | If one or more Qualified Bids is received by the Bid Deadline, the Debtors will conduct the Auction with respect to the Debtors' Assets. For the avoidance of doubt, the Debtors may also conduct more than one Auction with respect to non-overlapping material portions of the Debtors' Assets. The Auction will commence on **September 1, 2020, at 10:00 a.m., prevailing Eastern Time**, at the offices of Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611, telephonically, or by video via Zoom, or such later time or other place as the Debtors will timely notify all other Qualified Bidders, in consultation with the Consultation Parties.<br><br>**Auction Procedures:**<br><br>• the Auction will be conducted openly;<br><br>• only the Qualified Bidders, including the Stalking Horse Bidder, will be entitled to bid at the Auction;<br><br>• the Qualified Bidders, including the Stalking Horse Bidder, must appear in person, telephonically, or by video via Zoom, or through duly-authorized representatives at the Auction;<br><br>• only the duly-authorized representatives of each of the Qualified Bidders (including the Stalking Horse Bidder) and the Consultation Parties will be permitted to attend the Auction; *provided* that any party in interest may request permission to attend the Auction, and the Debtors may permit such party to attend the Auction;<br><br>• bidding at the Auction will begin at the Starting Bid;<br><br>• subsequent Bids at the Auction, including any Bids by any Stalking Horse Bidder, must be made in minimum increments of $5 million (or such other amount as the Debtors may determine in consultation with the Consultation Parties, which amount may be higher or lower than $5 million) of additional value, if applicable;<br><br>• each Qualified Bidder will be informed of the terms of the previous Bids and the Debtors shall, during the course of the Auction, promptly inform each Qualified Bidder of which subsequent Bids reflect, in the Debtors' reasonable business judgment, and in consultation with the Consultation Parties, the highest or otherwise best bid(s) for the applicable Assets;<br><br>• the Auction will be transcribed to ensure an accurate recording of the bidding at the Auction;<br><br>• each Qualified Bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the bidding or the Sale;<br><br>• the Auction will not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an overbid at the Auction to the then prevailing highest or otherwise best Bid, subject to the Debtors' right to require, in consultation with the Consultation Parties, last and final Bids to be submitted on a "blind" basis;<br><br>• the Debtors reserve the right, in their reasonable business judgment and in consultation with the Consultation Parties, to adjourn the Auction one or more times to, among other things, (a) facilitate discussions between the Debtors and Qualified Bidders, (b) allow Qualified Bidders to consider how they wish to |

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

|  | proceed, and (c) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, may require to establish that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount; and |
|  | • the Auction will be governed by such other Auction Procedures as may be announced by the Debtors and their advisors, after consultation with the Consultation Parties, from time to time on the record at the Auction; provided that such other Auction Procedures are (a) not inconsistent with the Bidding Procedures Order, the Bankruptcy Code, or any other order of the Bankruptcy Court, (b) disclosed orally or in writing to all Qualified Bidders and other attendees at the Auction and recorded on the record, and (c) determined by the Debtors, in good faith and in consultation with the Consultation Parties, to further the goal of attaining the highest or otherwise best offer for the Assets. |
|  | To remain eligible to participate in the Auction for a particular Asset, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding highest or otherwise best Bid submitted by a Qualified Bidder in such round of bidding, and (ii) to the extent a Qualified Bidder fails to submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding highest or otherwise best Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, such Qualified Bidder shall be disqualified from continuing to participate in the Auction for such Asset. |
|  | For the avoidance of doubt, nothing in the Auction Procedures will prevent the Debtors from exercising their respective fiduciary duties under applicable law (as reasonably determined in good faith by the Debtors in consultation with their outside legal counsel). **(Bidding Procedures, Section G)** |

## III.    THE BID PROTECTIONS

17.    To induce the Stalking Horse Bidder to expend the time, energy and resources necessary to negotiate and ultimately execute the Stalking Horse Agreement and to keep the Stalking Horse Bid memorialized therein open and irrevocable through the Debtors' competitive auction process, the Debtors have agreed to provide the Stalking Horse Bidder with, and seek this Court's approval of, certain protections pursuant to the terms of the Term Sheet and eventual Stalking Horse Agreement.  The Term Sheet provides for the payment to the Stalking Horse Bidder of a break-up fee equal to $22.8 million in cash (the "***Break-Up Fee***") in the event all or substantially all of the Assets to be sold to the Stalking Horse Bidder are sold to a third-party other

than the Stalking Horse Bidder or one of its affiliates. In addition, in such circumstances, the Term Sheet provides for the reimbursement of the Stalking Horse Bidder's reasonable, documented out-of-pocket expenses (including expenses of outside counsel, accountants and financial advisors) incurred in connection with Stalking Horse Bidder's evaluation, consideration and negotiation of the Stalking Horse Bid and in connection with the transactions contemplated thereby, up to a maximum amount equal to $3,000,000 (the "***Expense Reimbursement***" and, together with the Break-Up Fee, the "***Bid Protections***").

## IV.    FORM AND MANNER OF SALE NOTICE

18.    As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice, the Bidding Procedures Order, and the Bidding Procedures upon the following parties or their respective counsel, if known (collectively, the "***Notice Parties***"): (a) the UCC; (b) the U.S. Trustee for the Southern District of Delaware; (c) counsel to the agent for the Debtors' DIP Term Facility; (d) counsel to the agent for the Debtors' DIP ABL FILO Facility; (e) counsel to the Ad Hoc Group of Crossover Lenders; (f) counsel to the Ad Hoc FILO Term Lender Group; (g) counsel to the agent under the Debtors' secured term and asset-based financing facilities; (h) the indenture trustee for the Debtors' prepetition convertible notes; (i) the United States Attorney's Office for the District of Delaware; (h) the Internal Revenue Service; (j) the Securities and Exchange Commission; (k) the United States Drug Enforcement Agency; (l) the United States Food and Drug Administration; (m) any parties known or reasonably believed to have expressed an interest in the Debtors' assets; (n) all entities known or reasonably

believed to have asserted a lien, encumbrance, claim, or other interest in any of the Debtors' assets; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002.

19.    Additionally, as soon as practicable after entry of the Bidding Procedures Order, the Debtors shall publish a notice, substantially in the form of the Sale Notice, on one occasion, in *The Wall Street Journal (national edition), La Presse and The Globe and Mail*.  This publication notice will provide notice of the sale to any other interested parties whose identities are unknown to the Debtors.

20.    The Debtors submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed sale, including:  (a) the date, time, and place of the Auction (if one is held); (b) the Bidding Procedures and the dates and deadlines related thereto; (c) the dates and deadlines related to the Sale Hearing; and (d) instructions for promptly obtaining a copy of the Stalking Horse Agreement.  Accordingly, the Debtors request that the form and manner of the Sale Notice be approved and that the Court determine that no other or further notice of the Auction or Sale Hearing is required.

## V.    ASSUMPTION PROCEDURES/POST AUCTION NOTICE

21.    To facilitate the Sale, the Debtors seek authority to assume and assign executory the Assigned Contracts designated by the successful bidder to be assumed and assigned to the successful bidder.  The Debtors seek authority to assume and assign the Assigned Contracts to the successful bidder in accordance with the assumption and assignment procedures set forth below (the "***Assumption Procedures***").  The Assumption Procedures are as follows:

    a.    On or prior to July 31, 2020, (the "***Assumption Notice Deadline***"), the Debtors shall file with the Court, post on the case website at https://cases.primeclerk.com/gnc and serve on each counterparty (each, a "***Counterparty***," and collectively, the "***Counterparties***") to a Assigned Contract, the Assumption Notice.

    b.    The Assumption Notice shall include, without limitation, a list of Assigned Contracts (the "***Assigned Contract List***") that may be assumed and assigned  in connection with the Sale and the cure amount (each, a "***Cure Cost***"), if any, that the Debtors believe is required to be paid to the

applicable Counterparty under Bankruptcy Code sections 365(b)(1)(A) and (B) for each of the Assigned Contracts.  If no Cure Cost is listed on the Assigned Contracts List for a particular Assigned Contract, the Debtors' asserted Cure Cost for such Assigned Contract shall be deemed to be $0.00.  If a Counterparty objects to the Cure Cost, the Counterparty must file with the Court and serve on the Objection Notice Parties (as defined in the Bidding Procedures Order) a written objection (a "***Contract Objection***") on or before the Sale Objection Deadline.

c.       Any Contract Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules and Bankruptcy Local Rules; (iii) be filed with the Clerk of the Court on or before the Sale Objection Deadline, except as otherwise set forth below with respect to Assigned Contracts added to the Assigned Contracts List (or for which the proposed Cure Cost is modified) after the Assumption Notice Deadline; (iv) be served upon the Objection Notice Parties; and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under Bankruptcy Code sections 365(b)(1)(A) and (B) for the applicable Assigned Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.

d.       Any time after the Assumption Notice Deadline and before the date one (1) business day prior to the Sale Hearing, the Debtors reserve the right, and are authorized but not directed, to (i) add previously omitted Assigned Contracts to the Assigned Contracts List as contracts that may be assumed and assigned to a successful bidder in accordance with the definitive agreement for the Sale, (ii) remove an Assigned Contract from the Assigned Contract List that a successful bidder proposes be assumed and assigned to it in connection with the Sale, or (iii) modify the previously stated Cure Cost associated with any Assigned Contract.

e.       If, after the Assumption Notice Deadline additional executory contracts or unexpired leases of the Debtors are determined to be Assigned Contracts in connection with the Sale, as soon as practicable thereafter and in no event less than one (1) business day before the date of the Sale Hearing, the Debtors shall file with the Court and serve, by overnight delivery, on the applicable Counterparties a supplemental or revised Assumption Notice, and such Counterparties shall file any Contract Objections not later than (a) the Sale Objection Deadline in the event that such Assumption Notice was filed and served at least ten (10) days prior to the Sale Objection Deadline, (b) two (2) days prior to the Sale Hearing in the event that such Assumption Notice was filed and served at least seven (7) days prior to the commencement of the Sale Hearing, and (c) seven (7) days from the date such supplemental or revised Assumption Notice was filed and served in accordance with the above, in the event that such supplemental or revised Assumption Notice was filed and served less than seven (7) days prior to the commencement of the Sale Hearing.  In the event that such supplemental or revised Assumption Notice was filed and served less than seven (7) days prior to the commencement of the Sale Hearing and an objection is filed that is not otherwise consensually resolved, then such objection will not be adjudicated at the Sale Hearing and will be set for a subsequent hearing.

f.       As soon as practicable after the Auction and in no event less than one (1) business day before the date of the Sale Hearing, the Debtors shall file with the Court and serve, by overnight delivery, on the Counterparties the notice, substantially in the form attached as **Exhibit 4** to the Bidding Procedures Order (the "***Post-Auction Notice***"), identifying any successful bidder and back-up bidder(s), and the Counterparties shall file any Contract Objections solely on the basis of adequate assurance of future performance by the successful bidder and/or back-up bidder other than the Stalking Horse Bidder (each, an "***Adequate Assurance Objection***") not later than twenty-four (24) hours prior to the commencement of the Sale Hearing; *provided* that the deadline for any Counterparty to a Assigned Contract for which a supplemental or revised Assumption Notice was filed and served less than seven (7) days before the commencement of the Sale Hearing to assert an Adequate Assurance Objection shall be seven (7) days after the service of such supplemental or revised Assumption Notice.  In the event that such supplemental or revised Assumption Notice was filed and served less than seven (7) days prior to the commencement of the Sale Hearing and an

objection is filed that is not otherwise consensually resolved, then such objection will not be adjudicated at the Sale Hearing and will be set for a subsequent hearing.

g.        At the Sale Hearing, the Debtors will seek Court approval of the assumption and assignment to the successful bidder of only those Assigned Contracts that have been selected by the successful bidder to be assumed and assigned (collectively, the "***Selected Assigned Contracts***"). The inclusion of an Assigned Contract on an Assumption Notice will not (a) obligate the Debtors to assume any Assigned Contract listed thereon nor the Successful Bidder to take assignment of such Assigned Contract or (b) constitute any admission or agreement of the Debtors that such Assigned Contract is an executory contract.  The Debtors and their estates reserve any and all rights with respect to any Assigned Contracts that are not ultimately designated as Selected Assigned Contracts.

h.        If no Contract Objection is timely received with respect to a Selected Assigned Contract: (i) the Counterparty to such Selected Assigned Contract shall be deemed to have consented to the assumption by the Debtors and assignment to successful bidder of the Selected Assigned Contract, and be forever barred from asserting any objection with regard to such assumption or assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the successful bidder); (ii) any and all defaults under the Selected Assigned Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to Bankruptcy Code section 365(b)(1)(A) and (B) upon payment of the Cure Cost set forth in the Assumption Notice for such Selected Assigned Contract; and (iii) the Cure Cost set forth in the Assumption Notice for such Selected Assigned Contract shall be controlling, notwithstanding anything to the contrary in such Selected Assigned Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Cost and shall be forever barred from asserting any other claims related to such Selected Assigned Contract against the Debtors and their estates, the Successful Bidder, or the property of any of them, that existed prior to the entry of the order resolving the Contract Objections and the Sale Order.

i.        To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under Bankruptcy Code sections 365(b)(1)(A) and (B) (any such dispute, a "***Cure Dispute***"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be fixed by the Court; *provided*, *however*, that if the Contract Objection relates solely to a Cure Dispute, the Selected Assigned Contract may be assumed by the Debtors and assigned to the Successful Bidder, *provided* that the cure amount the Counterparty asserts is required to be paid under Bankruptcy Code section 365(b)(1)(A) and (B) (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

22.        Any party failing to timely file a Contract Objection with respect to the assumption and assignment of any Assigned Contract or related Cure Cost specified on an Assumption Notice will be barred from objecting thereto, including asserting any additional cure or other default amounts against the Debtors or any of the Debtors' estates, or the successful bidder, and shall be deemed to consent to the Sale and the assumption and assignment of such Assigned Contract assumed and assigned in connection therewith.

26723873.1

US-DOCS\116631501

23.     To provide the Counterparties with information concerning the successful bidder and any back-up bidder who may take assignment of their contracts or leases and enable them to object to such assignment on adequate assurance grounds (to the extent the successful bidder/back-up bidder is not the Stalking Horse Bidder), as soon as practicable after the Auction and in no event less than one (1) business day before the date of the Sale Hearing, the Debtors shall file with the Court and serve on all Counterparties a Post-Auction Notice substantially in the form attached as **Exhibit 4** to the Bidding Procedures Order.

## BASIS FOR RELIEF

## I.     THE RELIEF SOUGHT IN THE BIDDING PROCEDURES ORDER, INCLUDING ENTRY INTO THE STALKING HORSE AGREEMENT IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND SHOULD BE APPROVED

24.     Section 363(b) of the Bankruptcy Code provides that "[t]he [debtor in possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of a debtor's estate, courts have approved the authorization of a sale of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *See, e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

25.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale, (b) whether adequate and reasonable notice of the sale was provided to interested parties, (c) whether the sale will produce a fair and reasonable price for the property, and (d) whether the parties have acted in

26723873.1

US-DOCS\116631501

good faith.  *See In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry.  Co.*, 124 B.R. 169, 176 (D. Del. 1991)).  Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *In re Integrated Res., Inc.*, 147 B.R. at 656.

26.    Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that sale procedures "encourage bidding and…maximize the value of the debtor's assets").

27.    The Debtors have carefully designed a process that they believe will maximize the value of their estates, produce maximum recoveries, and result in a successful restructuring of their estates.  This process includes both entry into the Stalking Horse Agreement, to set a baseline bid for the auction, and the Bidding Procedures, which are designed to promote active bidding from seriously interested parties and to elicit the highest or otherwise best offers available for the Debtors' assets.  The Debtors are confident that the Bidding Procedures will allow the Debtors to solicit additional offers and conduct their sale process in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package of consideration for the assets and who can demonstrate the wherewithal take on the assets, obligations, and liabilities being transferred.  In particular, the Bidding Procedures contemplate an

open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

28.    The Debtors respectfully submit that the Stalking Horse Agreement and the Bidding Procedures will encourage robust bidding for the assets and are appropriate under, and consistent with, the relevant standards governing overbid processes in bankruptcy proceedings.  Accordingly, the Debtors respectfully submit that the Stalking Horse Agreement and the Bidding Procedures should be approved.

## II.    APPROVAL OF THE BID PROTECTIONS IS APPROPRIATE

29.    The Debtors believe that the Bid Protections are fair and reasonable under the circumstances.  The Bid Protections provided for in the Term Sheet were negotiated at arms' length and in good faith and were a necessary inducement to Stalking Horse Bidder's participation in the proposed sale transaction and willingness to subject its bid to a competitive auction process.  As discussed below, the Stalking Horse Bid sets a "floor" value for the Assets that maximizes the likelihood that the Debtors will receive the highest or otherwise best offer for the Assets to the benefit of the Debtors' estates.

30.    Approval of the Bid Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context.  Courts have identified at least two (2) instances in which bid protections may benefit the estate.  First, a break-up fee or expense reimbursement may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 533.  Second, if the availability of break-up fees and expense reimbursements

were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. *See id.*; *see also In re Reliant Energy Channel View LP*, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

31.    In *O'Brien*, the Third Circuit reviewed the following nine (9) factors set forth by the lower court as relevant in deciding whether to award a termination fee:

(a)    the presence of self-dealing or manipulation in negotiating the break-up fee;

(b)    whether the fee harms, rather than encourages, bidding;

(c)    the reasonableness of the break-up fee relative to the purchase price;

(d)    whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

(e)    the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

(f)    the correlation of the fee to a maximum value of the debtor's estate;

(g)    the support of the principal secured creditors and creditors' committees of the break-up fee;

(h)    the benefits of the safeguards to the debtor's estate; and

(i)    the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 536.

32.    While none of the factors is dispositive, an application of the facts to several of such factors supports the approval of the Bid Protections. In particular, the Bid Protections are necessary to preserve the value of the Debtors' estates because they will enable the Debtors to establish an adequate floor value for the Assets and to therefore insist that competing bids be

materially higher or otherwise better than the Stalking Horse Bid—a clear benefit to the Debtors' estates. The Stalking Horse Bidder would not agree to act as a stalking horse without the Bid Protections given the substantial time and expense it has incurred in connection with negotiating definitive documentation and the risk that it will be outbid at the Auction. Without the Bid Protections, the Debtors might lose the opportunity to obtain the highest or otherwise best offer for the Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder. The bid of the Stalking Horse Bidder sends a message to all potential bidders that the Assets are at least worth the Purchase Price and puts pressure on potential competing bidders to "put their best foot forward" in formulating their bids. Therefore, without the benefit of the bid of the Stalking Horse Bidder, the bids received at auction for the Assets could be substantially lower than the bid offered by the Stalking Horse Bidder.

33.    In addition, the Bid Protections were the product of hard-fought negotiations between the Debtors, their key creditor constituencies, and the Stalking Horse Bidder, in which the Debtors sought to both minimize the magnitude of Bid Protections payable and limit the circumstances under which they are payable. The resulting Bid Protections – consisting of a three percent Break-Up Fee and $3.0 million Expense Reimbursement – fall within the range of stalking horse bid protections approved in this District and others. *See In re Bumble Bee Parent, Inc.,* Case No. 19-12502 (LSS) (Bankr. D. Del. 2019) (approving break-up fee equal to approximately 2% of the $9.28 million purchase price and expense reimbursement of up to $2.5 million); *In re General Wireless Operations Inc. dba RadioShack*, Case No. 17-10506 (BLS) (Bankr. D. Del. 2017) (approving break-up fee equal to 3.3% of the $15 million purchase price); *In re Bostwick Laboratories, Inc., Case* No. 17-10570 (BLS) (Bankr. D. Del. 2017) (approving break-up fee equal to approximately 3.07% and expense reimbursement of up to 2.3% of approximate $6.5 million

purchase price*); In re PGHC Holdings, Inc.*, Case No. 18-12537 (MFW) (Bankr. D. Del. 2018) (approving break-up fee equal to 3% and expense reimbursement equal to 1% of $20 million purchase price).

34.     Finally, payment of the Bid Protections in the context of a sale to another purchaser will not diminish the Debtors' estates to the extent they become payable, as the Bidding Procedures require that any competing bid must exceed the Stalking Horse Bid by an amount in excess of the Break-Up Fee and Expense Reimbursement. Accordingly, based on the foregoing, the Debtors submit that the Bid Protections reflect a sound business purpose, are fair and appropriate under the circumstances, and should be approved.

## III.   THE ASSUMPTION PROCEDURES SHOULD BE APPROVED

35.     In connection with the assumption and assignment of certain Assigned Contracts, the Debtors believe it is necessary to establish a process by which (a) the Debtors and counterparties to Assigned Contracts can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code and (b) such counterparties can object to the assumption and assignment of the Assigned Contracts and/or related cure amounts.

36.     As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Assigned Contract be deemed to consent to (a) the assumption and assignment of the applicable Assigned Contract pursuant to section 365 of the Bankruptcy Code and (b) assignment notwithstanding any anti-alienation provision or other restriction on assignment. *See, e.g., Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

37.    The Debtors believe that the Assumption Procedures are fair and reasonable, provide sufficient notice to parties to the executory contracts, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof.  Accordingly, the Debtors request the Court approve the Assumption Procedures set forth in the Bidding Procedures Order.

## IV.    THE FORM AND MANNER OF THE SALE NOTICE AND POST-AUCTION NOTICE SHOULD BE APPROVED

38.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of an auction.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the proposed auction and the deadline for filing any objections to such a sale.

39.    As soon as reasonably practicable following entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice, the Bidding Procedures Order, and the Bidding Procedures to be served upon the Notice Parties.

40.    The Debtors submit that the Sale Notice, which includes information concerning the "free and clear" nature of the Sale, the Bidding Procedures, the Stalking Horse Bid, and other material information, constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002 and Local Rule 6004-1.  Accordingly, no further notice is necessary and the Debtors request that this Court approve the form and manner of the notice of the Sale Notice.

41.    In addition, to provide the Counterparties with information concerning the successful bidder and any back-up bidder who may take assignment of their contracts or leases and enable them to object to such assignment on adequate assurance grounds (to the extent the successful bidder/back-up bidder is not the Stalking Horse Bidder), as soon as practicable after the Auction and in no event less than one (1) business day before the date of the Sale Hearing, the Debtors shall file with the Court and serve on all Counterparties the Post-Auction Notice. The

Debtors submit that such service of the Post-Auction Notice is proper and sufficient to timely and proper notice that the Debtors will proceed with assumption and assignment of the Assigned Contracts in connection with the Sale. Accordingly, the Debtors request that this Court approve the form and manner of notice of the Post-Auction Notice.

## V.    APPROVAL OF THE SALE IS APPROPRIATE AND IN THE BEST INTERESTS OF THE DEBTORS' ESTATES

### A.    The Sale Should Be Approved as an Exercise of the Debtors' Sound Business Judgment

42.    Bankruptcy Code section 363(b) provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing. Although Bankruptcy Code section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have found that a debtor's sale or use of its assets outside the ordinary course of business should be approved if the debtor can demonstrate "some articulated business justification." *See In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991));.*In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3rd Cir. 1986); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983).

43.    Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

44.    The Debtors have a sound business justification for running a competitive bidding process for the sale of the Assets consistent with the Bidding Procedures.  The competitive bidding process will ensure that the Debtors obtain the best possible value for their assets, for the benefit of the Debtors' estates.  As such, the Debtors' determination to run a competitive bidding process for the sale of the Assets as provided for in the Bidding Procedures is a valid and sound exercise of the Debtors' business judgment.

### B.    Adequate and Reasonable Notice of the Sale Will Be Provided

45.    As set forth above, the Sale Notice (a) will be served in a manner that provides at least 21-days' notice of the date, time and location of the Auction and the Sale Hearing, (b) informs interested parties of the deadlines for objecting to the Sale, and (c) otherwise includes all information relevant to parties interested in or affected by the Sale.  Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order, after notice and a hearing, before it is served on parties in interest, and, as such, the Debtors are confident that the Sale Notice will be properly vetted by the time of service thereof.

### C.    The Sale Has Been Proposed in Good Faith and Without Collusion, and the Successful Bidder Will Each Be a "Good Faith Buyer"

46.    Pursuant to Bankruptcy Code section 363(m), a good-faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders); *see also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995). (3d Cir. 1986) (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the buyer and other

bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders); *see also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995).

47.      In other words, a party would have to show fraud or collusion between the successful bidder and the debtor-in-possession or trustee or other bidders in order to demonstrate a lack of good faith.  *See In re Pursuit Capital Mgmt., LLC*, 874 F.3d 124, 135 (3d Cir. 2017) ("The good faith requirement speaks to the integrity of [the purchaser's] conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In re Dura Auto. Sys., Inc.,* No. 06-11202 KJC, 2007 WL 7728109, at *96 (Bankr. D. Del. Aug. 15, 2007) (same).

48.      The Debtors submit that the successful bidder arising from the Auction (if any), will be a "good faith" purchaser within the meaning of Bankruptcy Code section 363(m) and the terms of any purchase agreement with any successful bidder will be negotiated at arms-length and in good faith without any collusion or fraud.[11]  Accordingly, the Debtors will be prepared to show at the hearing to approve any such sale that the successful bidder is entitled to the full protections of Bankruptcy Code section 363(m).

---

[11] Bankruptcy Code section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

*See* 11 U.S.C. § 363(m).

D. **The Sale Should Be Approved "Free and Clear" Under Bankruptcy Code Section 363(f)**

49.     Bankruptcy Code section 363(f) permits the Debtors to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).   As Bankruptcy Code section 363(f) is stated in the disjunctive, when proceeding pursuant to section 363(f), it is only necessary to meet one of the five conditions of section 363(f).   *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same). The Debtors believe that they will be able to demonstrate at the Sale Hearing that they have satisfied one or more of these conditions.

E. **Assumption and Assignment of Assigned Contracts Should Be Approved**

50.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).   Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease. *See*, *e.g.*, *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that a debtor's decision to assume or reject executory contract is governed by business judgment standard and may only be overturned if decision is product of bad faith, whim, or caprice).  The "business judgment" test in this context only requires that a debtor demonstrate that assumption or rejection of an executory

contract or unexpired lease benefits the estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989).

51.    Here, a review of relevant facts demonstrates that the Court should approve the decision to assume and assign the executory contracts and unexpired leases in connection with the Sale as a sound exercise of the Debtors' business judgment, consistent with the well-settled standard in this district governing same.   The potential Assigned Contracts include those executory contracts and unexpired leases that are necessary to run the Debtors' business.   It is unlikely that any purchaser would want to acquire any assets on a going-concern basis unless a significant number of the Assigned Contracts needed to conduct the business and manage the day-to-day operations were included in the transaction.   As such, making the potential Assigned Contracts available for assignment is essential to inducing the best offer for the Assets.

52.    Accordingly, the Debtors submit that the assumption and assignment of the Assigned Contracts by way of the Assumption Procedures should be approved as an exercise of their business judgment.

53.    Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract or unexpired lease is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code that a debtor (a) cure, or provide adequate assurance of prompt cure of, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.   11 U.S.C. § 365.   This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting nondebtor to get the performance it bargained for and the right of the debtor's creditors

to get the benefit of the debtor's bargain." *Matter of Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

54.     The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied.   The proposed Bidding Procedures Order and Assumption Procedures provide a clear process by which to resolve disputes over cure amounts or other defaults, which will afford counterparties a meaningful opportunity to challenge the Debtors' proposed cure amounts.   Once established, the cure amounts will be paid (either by the successful bidder, or the Debtors from the cash proceeds of the sale).   Thus, the Bidding Procedures and Assumption Procedures ensure that all defaults will be cured in connection with the assignment of the Assigned Contracts, as required by section 365(b)(1)(A).

55.     Similarly, the Debtors submit that counterparties will receive adequate assurance of future performance under the Assigned Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code.   "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." *Matter of U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).   Although no single solution will satisfy every case, the required assurance will fall short of an absolute guarantee of performance.   Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *Luce Indus.*, 8 B.R. at 107; *see also In re Great Atl. & Pac. Tea Co., Inc.*, 472 B.R. 666, 674 (S.D.N.Y. 2012) ("A debtor need not provide 'an absolute guarantee of performance.'").

56.     The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of certain Assigned Contracts to the Stalking Horse Bidder (or other

successful bidder) will be satisfied at the Sale Hearing.  As required by the Bidding Procedures,

the Debtors will evaluate the financial wherewithal of potential bidders before designating such

party a Qualified Bidder (*e.g.*, financial credibility, willingness and ability of the interested party

to perform under the Assigned Contracts).  Further, all counterparties will be provided with notice

of the proposed assumption and assignment and will have adequate time and opportunity to object

to the assumption or proposed cure amount or otherwise be heard with respect thereto.

### WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)

57.     To implement the foregoing successfully, the Debtors seek a waiver of the notice

requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use,

sale, or lease of property under Bankruptcy Rule 6004(h).

### NOTICE

58.     Notice of this Motion will be given to: (a) the United States Trustee for the District

of Delaware; (b) counsel to the agent for the Debtors' DIP Term Facility; (c) counsel to the agent

for the Debtors' DIP ABL FILO Facility; (d) counsel to the Ad Hoc Group of Crossover Lenders;

(e) counsel to the Ad Hoc FILO Term Lender Group; (f) counsel to the agent under the Debtors'

secured term and asset-based financing facilities; (g) the indenture trustee for the Debtors'

prepetition convertible notes; (h) counsel to the Stalking Horse Bidder; (i) the parties included on

the Debtors' consolidated list of thirty (30) largest unsecured creditors; (j) the United States

Attorney's Office for the District of Delaware; (k) the attorneys general for all 50 states and the

District of Columbia; (l) the United States Department of Justice; (m) the Internal Revenue

Service; (n) the Securities and Exchange Commission; (o) the United States Drug Enforcement

Agency; (p) the United States Food and Drug Administration; (q) the Banks; and (r) all parties

requesting notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the

circumstances, no other or further notice is required.

26723873.1

US-DOCS\116631501

**WHEREFORE**, the Debtors respectfully request that the Court enter the Bidding Procedures Order, granting the relief requested in this Motion and such other relief as may be just and proper.

Dated: July 1, 2020
      Wilmington, Delaware

<table>
<tr>
<td valign="top">

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**


*/s/ Joseph M. Mulvihill*
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Andrew L. Magaziner (No. 5426)
Joseph M. Mulvihill (No. 6061)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:     mnestor@ycst.com
         kcoyle@ycst.com
         amagaziner@ycst.com
         jmulvihill@ycst.com

</td>
<td valign="top">

**LATHAM & WATKINS LLP**
Richard A. Levy (admitted *pro hac vice*)
Caroline A. Reckler (admitted *pro hac vice*)
Asif Attarwala (admitted *pro hac vice*)
Brett V. Newman (admitted *pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
Email:     richard.levy@lw.com
         caroline.reckler@lw.com
         asif.attarwala@lw.com
         brett.newman@lw.com

- and -

George A. Davis (admitted *pro hac vice*)
Andrew C. Ambruoso (admitted *pro hac vice)*
Jeffrey T. Mispagel (admitted *pro hac vice*)
885 Third Avenue
New York, New York 10022
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
Email:     george.davis@lw.com
         andrew.ambruoso@lw.com
         jeffrey.mispagel@lw.com

</td>
</tr>
</table>

*Proposed Counsel for Debtors and Debtors in Possession*