**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| GNC HOLDINGS, INC., *et al.,* [1] | ) | Case No. 20-11662 (KBO) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: Docket No. 1301** |
|  | ) |  |

**RITE AID HDQTRS. CORP.'S LIMITED OBJECTION TO AND RESERVATION OF RIGHTS WITH RESPECT TO: (I) THE FIFTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF GNC HOLDINGS, INC. AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE; AND (II) TO THE ASSUMPTION OF A CERTAIN EXECUTORY CONTRACT**

Rite Aid HDQTRS. Corp. ("Rite Aid") by and through its undersigned counsel, hereby submits this limited objection and reservation of rights (the "Limited Objection") to the *Fifth Amended Joint Chapter 11 Plan of Reorganization of GNC Holdings, Inc. and Its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* [Docket No. 1301] (as may be amended or supplemented from time to time, the "Plan").[2]  In support of the Limited Objection, Rite Aid respectfully states as follows:

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's United States federal tax identification number, if applicable, or other applicable identification number, are: GNC Holdings, Inc. (6244); GNC Parent LLC (7572); GNC Corporation (5170); General Nutrition Centers, Inc. (5168); General Nutrition Corporation (4574); General Nutrition Investment Company (3878); Lucky Oldco Corporation (7141); GNC Funding, Inc. (7837); GNC International Holdings, Inc. (9873); GNC China Holdco, LLC (0004); GNC Headquarters LLC (7550); Gustine Sixth Avenue Associates, Ltd. (0731); GNC Canada Holdings, Inc. (3879); General Nutrition Centres Company (0939); GNC Government Services, LLC (2226); GNC Puerto Rico Holdings, Inc. (4559); and GNC Puerto Rico, LLC (7234). The Debtors' mailing address is 300 Sixth Avenue, Pittsburgh, Pennsylvania 15222.

[2]  Capitalized terms used but not defined herein shall have the meaning ascribed to in the Plan.

## PRELIMINARY STATEMENT[3]

Rite Aid generally does not object to the Debtors' attempts to confirm the Plan. Indeed, in the event of a Sale Transaction, Rite Aid looks forward to a productive ongoing business relationship with GNC Newco, who has listed Rite Aid's Retail Agreement as among the Executory Contracts that will be assigned to it by the Debtors. However, if the Sale Transaction does not close and the Debtors, instead, pursue a Restructuring, the Plan as currently drafted deprives Rite Aid of critical rights that it is entitled to as a non-Debtor counterparty to an Executory Contract under section 365 of the Bankruptcy Code. Rite Aid files this Limited Objection to protect these rights.

Under the terms of the Sale, as approved by the Court's Sale Order, the Debtors shall assume and assign to GNC Newco the Retail Agreement between Rite Aid and GNC. As a condition to such assumption and assignment, the Sale Order provides that "the Debtors shall promptly (and in any event no later than the Closing Date) pay all cure obligations arising at any time between the deadline for non-Debtor counterparties to object to the Debtors' proposed Cure Costs and the Closing Date under any Selected Assigned Contract [such as the Retail Agreement]." *See* Sale Order at ¶ 18. Further, the Sale Order provides that "notwithstanding anything to the contrary in this Sale Order or the Stalking Horse Agreement, all obligations arising under the Selected Assigned Contracts [such as the Retail Agreement] prior to the Closing Date, but that are not in default as of the Closing Date, shall be assumed by Buyer on the Closing Date and paid by Buyer in the ordinary course of business as and when they come due." *Id*.

---

[3] Capitalized terms used but not defined in this Preliminary Statement shall have the meaning ascribed to them elsewhere in this Limited Objection.

In stark contrast, the Plan currently provides neither of these protections for non-Debtor counterparties to Executory Contracts and Unexpired Leases.  As drafted, the Plan provides no mechanism for non-Debtor counterparties to assert additional Cure Costs that may arise following the deadline for such counterparties to object to the Debtors' proposed Cure Cost—which, under the Plan, is the October 5, 2020 deadline for filing Plan objections (the "<u>Cure Objection Deadline</u>")—and prior to the Plan's Effective Date (the "<u>Post-Cure Objection Deadline Cure Costs</u>"), nor any assurance that any these Post-Cure Objection Deadline Cure Costs will be paid.

Further, the Plan, as written, fails to account for otherwise valid and enforceable amounts owing under Executory Contracts or Unexpired Leases that may arise prior to the Plan's Effective Date, but that are not technically "cure" amounts under the Bankruptcy Code because they are claims that are not in default as of the date that the Debtors assume Executory Contracts and Unexpired Leases (the "<u>Assumption Date</u>").  Such claims include amounts that have been invoiced but are not overdue as of the Assumption Date and amounts that have accrued, but have not been invoiced, as of the Assumption Date (collectively, "<u>Accruals</u>").  Indeed, read literally, the Plan grants the Debtors a release for all claims arising under assumed Executory Contracts upon the assumption of those contracts, without excepting from such releases the payment of Cure Costs (including Post-Cure Objection Deadline Cure Costs) and Accruals.

The provisions in the Sale Order that protect non-Debtor Counterparties' rights to be paid all Cure Costs (including those arising after the applicable cure objection deadline) and to be paid all Accruals in the ordinary course were included in the Sale Order as a result of Rite Aid's Limited Response to the Sale and the negotiations with the Debtors that followed.  Rite Aid files this Limited Objection to the Plan to ensure the very same protections that Rite Aid is afforded in

the event of a Sale Transaction—and, in all events, that Rite Aid is entitled to under the Bankruptcy Code—apply with full force and effect if the Debtors pursue a Restructuring. Rite Aid is confident that these issues can be resolved through language added to an order confirming the Plan.

Further, Rite Aid has not received a cure notice in connection with the Plan stating that the Debtors intend to assume the Retail Agreement under the Plan in the event that a Sale Transaction is not consummated and providing what the Debtors believe to be the Cure Cost for such contract (though Rite Aid did receive the Cure Notice in connection with the Sale Transaction). While Rite Aid's current Cure Cost (*i.e.*, the amount of defaults that are currently owed by the Debtors to Rite Aid under the Retail Agreement, and <u>not</u> including Accruals, which, by definition, are not in default) is $0.00, Rite Aid reserves its rights to assert any Cure Costs that may arise between the Cure Objection Deadline and the Assumption Date (as well as reserving all of its rights with respect to Accruals).

## <u>BACKGROUND REGARDING THE RETAIL AGREEMENT</u>

**A.     GNC's Indemnification Obligations under the Retail Agreement**

1.     As of the Petition Date, Debtor General Nutrition Corporation ("<u>GNC</u>") and Rite Aid were parties that certain Amended and Restated GNC/Rite Aid Retail Agreement, entered into and dated as of December 8, 1998, amended on November 20, 2000, May 1, 2004, and July 2007, and amended and restated on December 5, 2018 (the "<u>Retail Agreement</u>"). The Retail Agreement provided the terms of a buyer/seller relationship, whereby Rite Aid would, among other things, purchase, and then sell to consumers, certain of GNC's products.

#110460346 v5

2.    Article XVI of the Retail Agreement contains certain indemnification provisions, including those providing for the indemnification of Rite Aid by GNC in certain circumstances. Specifically, Article XVI, Paragraph C of the Retail Agreement provides:

> GNC shall indemnify and hold harmless Rite Aid, its affiliates and their respective officers, directors and employees against any and all claims arising out of or resulting from any breach or default by GNC or its affiliates in connection with this Retail Agreement; arising from any benefit or structure function statement used on the GNC Brand Product; and/or from the failure to meet the quality, purity or labeling of any GNC Brand Product or arising out of or resulting from advertising by GNC of any GNC Brand Product by GNC or its affiliates.

Retail Agreement, Art. XVI, Para. C.

3.    Article XVI, Paragraph D of the Retail Agreement sets forth certain terms whereby an "Indemnifying Person" (as defined in the Retail Agreement) must pay for the costs of an action taken against an "Indemnified Person" (as defined in the Retail Agreement), including the employment of counsel and the settlement of such actions.

4.    Since entering into the Retail Agreement and prior to the Petition Date, Rite Aid has been subject to potential liability for which it is entitled to indemnification under the Retail Agreement.  Rite Aid's indemnification claims against GNC include certain claims which are fixed and non-contingent, as well as claims that are currently disputed, unliquidated and contingent, arising from legal action and other litigation claims against Rite Aid.  On August 26, 2020, Rite Aid filed proof of claim number 2051 (the "Proof of Claim", which is incorporated herein by reference) on account of these indemnification claims, asserting a pre-petition claim against GNC in the aggregate amount of not less than $10,000.00 together with unliquidated, pre-petition, contingent, claims for any liabilities of Rite Aid giving rise to pre-petition indemnification claims against GNC under the Retail Agreement or otherwise (collectively, the "Pre-Petition Indemnification Claims").

5

5.      Further, Rite Aid and GNC agreed that GNC would pay for attorney fees directly to Rite Aid's defense counsel until August 1, 2020; on and after August 1, 2020, Rite Aid has, due to the Debtors' bankruptcy filings, been forced to pay for its legal defense fees, for which it must be indemnified under the terms of the Retail Agreement. As of August 20, 2020, Rite Aid incurred approximately $1,586.50 in legal fees in its defense of the case *Silva*, et al. *v. Rite Aid Corporation*, No. 1:18-cv-02135 (M. D. Pa.), has incurred further fees since that date and may incur further legal expenses in the *Silva* case prior to the closing of any sale of substantially all of the Debtors' assets or the Effective Date of the Plan if the Debtors' pursue a Restructuring (all such amounts, which includes amounts arising after August 20, 2020, the "Post-Petition *Silva* Fees").  Further, as of August 20, 2020, Rite Aid incurred approximately $1,133.40 in legal fees in its defense of the case *Clement v. Rite Aid Corporation and Rite Aid of New York, Inc.*, Index No. 158879/2019 (Supreme Court of the State of New York, County of New York) has incurred further fees since that date and may incur further legal expenses in the *Silva* case prior to the closing of any sale of substantially all of the Debtors' assets or the Effective Date of the Plan if the Debtors' pursue a Restructuring (all such amounts, which includes amounts arising after August 20, 2020, the "Post-Petition *Clement* Fees" and, together with the Post-Petition *Silva* Fees, the "Post-Petition Indemnification Claims).  Although all Post-Petition Indemnification Claims must be paid by GNC, none of these amounts are currently in default and, as such, no "Cure Costs" are currently due with respect to such obligations.

6.      Finally, as various legal actions taken against Rite Aid arise and continue to progress, Rite Aid may continue to incur legal expenses and/or make settlement payments for which GNC has an obligation to indemnify Rite Aid under the Retail Agreement (such amounts, the "Unaccrued Indemnification Claims").  While such Unaccrued Indemnification Claims

cannot be accounted for presently, GNC will be obligated to pay such claims once they accrue and become due under the terms of the Retail Agreement.

**B.      GNC's Advertising Support Obligations under the Retail Agreement**

7.      Pursuant to the Retail Agreement, "GNC shall provide Rite Aid with a 1.5% off invoice allowance on all invoices of Rite Aid purchases of GNC Brand Product for advertising support."  This 1.5% advertising support is based on Rite Aid's gross warehouse purchases of GNC product for a given billing period and is charged against GNC after Rite Aid has been invoiced for that billing period (such charges, the "Advertising Support Charges").  To date, Advertising Support Charges, including those billed post-petition, have been billed and satisfied in the ordinary course of business and there are no such charges that are currently in default although it is possible that defaults may arise or exist as of the Assumption Date.  GNC is required to pay Advertising Support Charges for billing periods through January 1, 2021.

## PROCEDURAL BACKGROUND

8.      On July 1, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order Approving (I)(A) the Debtors' Entry Into Stalking Horse Agreement And Related Bid Protections, (B) the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (C) the Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases, (D) the Form and Manner of Notice of the Sale Hearing, Assumption Procedures, and Auction Results, and (E) Dates for an Auction and Sale Hearing, (II)(A) the Sale of Substantially All of the Debtors' Assets Free and Clear of All Claims, Liens, Liabilities, Rights, Interests and Encumbrances, and (B) the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (III) Related Relief, and (III) Granting Related Relief*  [Docket No. 227] (the "Sale Motion") seeking, among other things, the entry of

an order approving for the sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.

9.        On July 31, 2020, the Debtors filed the *Notice of Potential Assumption of Executory Contracts or Unexpired Leases and Cure Amounts* [Docket No. 614] (the "Cure Notice").  Attached to the Cure Notice as Exhibit 1 was a list of Executory Contracts that the Debtors intend to assume and assign to the post-sale going concern entity to be owned or controlled by the Successful Bidder (as defined in the Stalking Horse Agreement (defined below), "GNC Newco") in connection with the Sale Transaction, along with the Debtors' proposed Cure Costs that must be paid to assume and assign such contracts.  On Exhibit 1 to the Cure Notice, the Debtors listed the Retail Agreement with a cure amount of $0.00.  *See* Cure Notice, Exhibit 1, Item 2752.

10.        On August 27, 2020, Rite Aid filed the *Rite Aid HDQTRS. Corp.'s Limited Response to and Reservation of Rights with Respect to: (I) the Sale of Substantially All of the Debtors' Assets; and (II) the Debtors' Assumption and Assignment of, and the Cure Amount Pertaining to, an Executory Contract Between Rite Aid HDQTRS. Corp and General Nutrition Corporation* [Docket No. 974] (the "Limited Response to the Sale").  In the Limited Response to the Sale, Rite Aid reserved its rights to assert Cure Costs that may arise after the objection deadline applicable to the Cure Notice, objected to the Sale Motion insofar as it did not provide a mechanism for non-Debtor counterparties to Executory Contracts or Unexpired Leases to be paid on Accruals or to assert and be paid further cure amounts that would arise between the cure objection deadline and the closing of the proposed sale.

11.        On September 18, 2020, the Court entered the *Order (I) Authorizing and Approving (A) the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens,*

*Claims, and Encumbrances and (B) the Assumption and Assignment of Certain Executory*

*Contracts and Unexpired Leases in Connection Therewith, and (II) Granting Related Relief*

[Docket No. 1202] (the "Sale Order"), which approved the sale of substantially all of the

Debtors' assets pursuant to the terms and conditions of the Stalking Horse Agreement dated as of

August 7, 2020 (together with all amendments, as attached to the Sale Order as Exhibit A

thereto, and as may be amended, modified, or supplemented in accordance with the terms of the

Sale Order, the "Stalking Horse Agreement").  With respect to the assumption and assignment of

Executory Contracts and Unexpired Leases, paragraph 18 of the Sale Order required that the

Debtors pay all Cure Costs for any Executory Contracts and Unexpired Leases they intended to

assume and assign and further provided, in relevant part:

> . . . the Debtors shall promptly (and in any event no later than the Closing Date)
> pay all cure obligations arising at any time between the deadline for non-Debtor
> counterparties to object to the Debtors' proposed Cure Costs and the Closing Date
> under any Selected Assigned Contract (the "***Post-Cure Objection Deadline Cure
> Costs***") to the applicable non-Debtor counterparty to each Selected Assigned
> Contract (and such non-Debtor counterparties shall retain all rights to enforce
> prompt payment of such Post-Cure Objection Deadline Cure Costs, including the
> right to file an administrative expense claim); and provided, further, that,
> notwithstanding anything to the contrary in this Sale Order or the Stalking Horse
> Agreement, all obligations arising under the Selected Assigned Contracts prior to
> the Closing Date, but that are not in default as of the Closing Date, shall be
> assumed by Buyer on the Closing Date and paid by Buyer in the ordinary course
> of business as and when they come due.

Sale Order, at ¶ 18.

12.    Between the time that the Limited Response to the Sale was filed and the Sale

Order was entered, Rite Aid and the Debtors engaged in negotiations to ensure that the rights of

non-Debtor counterparties to Executory Contracts and Unexpired Leases were preserved through

the inclusion of the above-quoted language.

#110460346 v5

13.     On September 30, 2020, the Debtors filed the current iteration of the Plan.  Under the Plan, in the event that the Sale Transaction does not occur, all Executory Contracts and Unexpired Leases that have not been rejected or terminated shall be deemed to be assumed.  *See* Plan, at Art. V., Sec. A.  As of the date hereof, other than the Cure Notice that was filed and served in connection with the Sale Transaction, Rite Aid has not, upon information and belief, received any cure notice with respect to an assumption of the Retail Agreement under the Plan (in the event a Sale Transaction does not occur) and the Debtors' proposed Cure Cost, nor any notice confirming the Debtors' intent to reject the Retail Agreement under the Plan (in the event a Sale Transaction does not occur).  Similarly, the Retail Agreement does not appear anywhere on any Plan Supplement indicating the Debtors' intentions as to assumption or rejection (which means, under the terms of the Plan, that the Retail Agreement would otherwise be assumed should the Debtors pursue a Restructuring in lieu of a Sale Transaction).

## LIMITED OBJECTION AND RESERVATION OF RIGHTS

### A.     Objection to Plan

14.     The Plan is objectionable because it does not provide all of the necessary protections granted by section 365 of the Bankruptcy Code to parties whose contracts will be assumed by the Debtors.

15.     It is well settled that, where a debtor-in-possession elects to assume an executory contract under section 365 of the Bankruptcy Code, it assumes the contract *cum onere*; that is, the Debtors may only assume the entire contract, with all of the benefits, burdens and obligations attendant thereto.  *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 531-32 (1984) (holding that, "[s]hould the debtor-in-possession elect to assume the executory contract, however, it assumes the contract *cum onere* . . . and the expenses and liabilities incurred may be treated as

10

administrative expenses, which are afforded the highest priority on the debtor's estate"); *Pirinate Consulting Grp., LLC v. C. R. Meyer & Sons Co. (In re Newpage Corp.)*, Nos. 11-12804(KG), 13-52429, 2017 Bankr. LEXIS 413, at *14 (Bankr. D. Del. Feb. 13, 2017) ("A debtor 'can only assume a contract *cum onere*—accepting the benefits along with the burdens.'") (quoting *In re Physiotherapy Holdings, Inc.*, 538 B.R. 225, 229 (D. Del. 2015) (citing *In re Fleming Cos.*, 499 F.3d 300, 308 (3d Cir. 2007)); *accord In re Klein Sleep Products, Inc.*, 78 F.3d 18, 24 (2d Cir. 1996) (same); *City of Covington v. Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1226 (6th Cir. 1995) ("When the debtor assumes the lease or the contract under § 365, it must assume both the benefits and the burdens of the contract. Neither the debtor nor the bankruptcy court may excise material obligations owing to the non-debtor contracting party.").

16.     Accordingly, to assume an executory contract, the Debtors must cure both pre- and **post-petition** defaults.   11 U.S.C. § 365(b)(1); *see In re Fleming Cos.*, No. 03-10945 (MFW), 2004 Bankr. LEXIS 198, at *13 (Bankr. D. Del. Feb. 27, 2004) ("Section 365 provides that a debtor cannot assume an executory contract on which there has been a default unless it cures or provides adequate assurance that it will promptly cure such default.") (citing 11 U.S.C. § 365(b)(1)(A)); *accord In re Stoltz*, 315 F.3d 80 (2d Cir. 2002); *In re Liljeberg Eners., Inc.*, 304 F.3d 410 (5th Cir. 2002); *In re Overland Park Fin. Corp.*, 236 F.3d 1246 (10th Cir. 2001); *In re Building Block Child Care Ctrs., Inc.*, 234 B.R. 762 (9th Cir. BAP 1999); *In re Washington Capital Aviation & Leasing*, 156 B.R. 167, 173 (Bankr. E.D. Va. 1993); *In re Tel-A-Communications Consultants, Inc.*, 50 B.R. 250 (Bankr. D. Conn. 1985); *In re North American Rental*, 54 B.R. 574 (Bankr. D. N.H. 1985).  Thus, in order for the Debtors to assume the Retail Agreement, **all** amounts in default as of the Assumption Date must be paid, including any Post-Cure Objection Deadline Cure Costs.  However, as written, the Plan provides no mechanism for

any counterparty to an Executory Contract or Unexpired Lease to assert further cures as they arise after the Cure Objection Deadline—any order confirming the Plan must provide such a mechanism and explicitly provide that the payment of **all** Cure Costs (including such Post-Cure Objection Deadline Cure Costs) must be paid by the Debtors as a prerequisite to the assumption of the relevant Executory Contract or Unexpired Lease.

17.    Moreover, in addition to requiring, as a condition of assumption, that a debtor provide a prompt cure for all monetary defaults thereunder, section 365(b)(1)(C) of the Bankruptcy Code requires adequate assurance of future performance under such contract. *See* 11 U.S.C. § 365(b)(1)(A)-(C).   As such, under the Bankruptcy Code, the Plan **must** provide for assumption of (and adequate assurance of payment for) **all obligations** under assumed Executory Contracts and Unexpired Leases as of the Assumption Date—not just cure amounts.

18.    The Plan provides that, subject to the resolution of any dispute regarding assumption, any Cure Cost with respect to an Executory Contract or Unexpired Lease to be assumed shall be handled as follows:

> Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Cost in Cash on the Effective Date or as soon as reasonably practicable. . .

*Id.,* at Art. V, Sec. B.

19.     The Plan defines "Cure Cost", in relevant part, to mean "all amounts . . . required to cure any monetary defaults under any Executory Contract or Unexpired Lease . . . that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code whether in connection with the Restructuring or a Sale Transaction." *Id*., at Art. I, Sec. A, ¶ 66.

20.    In addition to pre- and post-petition monetary defaults that exist under Executory Contracts and Unexpired Leases, the Debtors are (or will become) contractually liable for

#110460346 v5

Accruals.  While Accruals are not technically *Cure Costs* (because such obligations are not in default), they are, nonetheless, valid claims arising prior to the Assumption Date and must be paid as and when they come due pursuant to section 365 of the Bankruptcy Code.

21.      The Bankruptcy Code demands that, in order for an executory contract to be assumed by a debtor, all Cure Costs (including Post-Cure Objection Deadline Cure Costs) must be paid and that all Accruals must be satisfied as and when such obligations come due. However, the Plan appears to do exactly the opposite—providing for a release of claims upon the assumption of an Executory Contract or Unexpired Lease without providing for the payment of Accruals, stating as follows:

> Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise together with the payment of all related Cure Costs shall result in the full satisfaction and cure of any Claims and defaults, whether monetary or nonmonetary, that are required to be cured pursuant to section 365 of the Bankruptcy Code under any assumed Executory Contract or Unexpired Lease arising at any time prior to the effective date of assumption . . .

*Id*.  Any order confirming the Plan should make clear that, notwithstanding such language of the Plan, any release is only effective upon payment in full of all Cure Costs and Accruals to the non-Debtor counterparties to assumed Executory Contracts or Unexpired Leases.

22.      To that end, Rite Aid proposes the insertion of the following language in any order confirming the Plan:

> Notwithstanding anything to the contrary in the Plan, any Plan Supplement, or this Confirmation Order with respect to all Executory Contracts and Unexpired Leases assumed under the Plan (the "**Plan Assumed Agreements**") and not in connection with a Sale Transaction (either because no Sale Transaction is consummated or because the Sale Transaction did not provide for the assumption of such Plan Assumed Agreement): (I) in addition to paying any Cure Costs arising prior to the cure objection deadline, the Debtors shall promptly (and in any event no later than the date such agreements are to be assumed under the Plan (the "**Assumption Date**")) pay all Cure Costs arising at any time between such cure objection deadline and the Assumption Date (the "**Post-Cure Objection Deadline Cure Costs**"); (II) all non-Debtor counterparties to any Plan Assumed

Agreement may, on or before the Administrative Claims Bar Date, assert Post-Cure Objection Deadline Cure Costs arising at any time prior to the Assumption Date of such Plan Assumed Agreement, with the any disputes over such asserted Post-Cure Objection Deadline Cure Costs to be resolved consistent with the procedures laid out in Article V, Section B of the Plan as though the asserted Cure Costs were filed prior to the deadline to object to Cure Costs; (III) all obligations arising under any Plan Assumed Agreement prior to the Assumption Date, but that are not in default as of the Assumption Date ("**Accruals**"), shall be fully enforceable against and paid by the Debtors (or the Reorganized Debtors, as the case may be) in the ordinary course of business as and when they come due and such claims shall not be discharged or subject to any injunction under the Plan, Confirmation Order, or otherwise (and non-Debtor parties shall not be required to file administrative claims to preserve their right to the payment of such Accruals); and (IV) with respect to any Plan Assumed Agreement, unless and until all Cure Costs (including Post-Cure Objection Deadline Cure Costs) and all Accruals arising under such agreement are paid in full, neither the Debtors nor the Reorganized Debtors shall be released from any claims for such Cure Costs (including Post-Cure Objection Deadline Cure Costs) or Accruals.

23.     The Bankruptcy Code's guarantee of adequate assurance of future performance demands that non-Debtor counterparties to the Debtors' Executory Contracts or Unexpired Leases are not "left holding the bag" for Cure Costs arising from pre- and post-petition defaults and Accruals existing at the time such agreements are assumed—the Plan and confirmation order should clearly provide that these obligations will be assumed and paid in full by the Debtors or the Reorganized Debtors (as the case may be).

**B.     Reservation of Rights with Respect to Cure Costs and Accruals under the Retail Agreement**

24.     Subject to the foregoing limited Plan objection and the reservation of rights with respect to Cure Costs and Accruals stated herein, Rite Aid does not object to the Debtors' assumption of the Retail Agreement under the Plan, should a Sale Transaction not occur. Rite Aid, however, has not, upon information and belief, received any cure notice with respect to the assumption of the Retail Agreement under the Plan and therefore does not know the amount that the Debtors believe they need to pay Rite in satisfaction of all of Rite Aid's Cure Costs.

#110460346 v5

25.     As of the date hereof, the current Cure Cost of the Retail Agreement is $0.00. However, certain Accruals—including, but not limited to, the Pre-Petition Indemnification Claims and the Post-Petition Indemnification Claims, which total at no less than $12,719.90— may be in default as of the Assumption Date and would entitle Rite Aid to receive payments for Cure Costs with respect to these amounts.  To the extent any such defaults exist as of the Assumption Date, Rite Aid reserves its right to seek payment of all Cure Costs under the Plan. Furthermore, any order confirming the Plan should provide a mechanism for counterparties to preserve and assert Cure Costs arising after the present objection deadline of October 5, 2020 through the date any applicable Assumption Date for such Executory Contract or Unexpired Lease.

26.     Similarly, certain amounts that may not have yet accrued—including, but not limited to, any Unaccrued Indemnification Claims and unaccrued Advertising Support Charges—may become Accruals prior to the Assumption Date.  When such amounts arise as Accruals, Rite Aid hereby reserves its rights to be paid on such Accruals in the ordinary course by the Debtors or the Reorganize Debtors (as the case may be).

## CONCLUSION

WHEREFORE, Rite Aid hereby: (i) respectfully requests that the Court condition the entry of an order confirming the Debtors' Plan upon the inclusion of language in any order confirming or approving the Plan (and/or in any amended version of the Plan) in the form requested by Rite Aid in this Limited Objection that, among other things, expressly provides that, notwithstanding anything in the Plan to the contrary, non-debtor counterparties to Executory Contracts or Unexpired Leases shall be entitled to payment in full on any and all Cure Costs (including Post-Cure Objection Deadline Cure Costs) and Accruals existing as of the

Assumption Date of each such agreement, and such Accruals shall be paid as and when they come due in the ordinary course of business; (ii) reserves its rights to assert all amounts due under the Retail Agreement as Cure Costs as and when they come due; (iii) reserves its right to assert Accruals as they arise under the Retail Agreement, and to demand payment of Accruals and Cure Costs; and (iv) seeks such other relief as is just and appropriate.

Dated: October 5, 2020
Wilmington, Delaware

**TROUTMAN PEPPER HAMILTON SANDERS LLP**

/s/ Henry J. Jaffe
Henry J. Jaffe (DE Bar No. 2987)
Kenneth A. Listwak (DE Bar No. 6300)
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, Delaware  19899-1709
Telephone:    (302) 777-6500
Facsimile:    (302) 421-8390
Email:        henry.jaffe@troutman.com
              kenneth.listwak@troutman.com

*Counsel for Rite Aid HDQTRS. Corp.*

16

## <u>CERTIFICATE OF SERVICE</u>

I, Henry J. Jaffe, hereby certify that on the 5th day of October, 2020, I caused the foregoing

*Rite Aid HDQTRS. Corp.'s Limited Objection to and Reservation of Rights with Respect to: (I) the*

*Fifth Amended Joint Chapter 11 Plan of Reorganization of GNC Holdings, Inc. and Its Debtor*

*Affiliates under Chapter 11 of the Bankruptcy Code; and (II) to the Assumption of a Certain*

*Executory Contract* to be served upon the parties set forth on the attached service list, in the manner

indicated; and all ECF participants in this case were served electronically through the Court's ECF

noticing system, at their respective email addresses registered with the Court.

*/s/ Henry J. Jaffe*
Henry J. Jaffe (DE No. 2987)

**GNC Holdings, Inc., et al.  20-11662 (KBO)**
**SERVICE LIST**

**Federal Express and Email**
*(Co-counsel to the Debtors*)
Richard A. Levy, Caroline A. Reckler, Asif Attarwala, and Brett Newman
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL  60611
Richard.levy@lw.com; caroline.reckler@lw.com; asif.attarwala@lw.com;
brett.newman@lw.com

**Federal Express and Email**
*(Co-counsel to the Debtors*)
Andrew Ambruoso and Jeffrey T. Mispagel
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022
andrew.ambruoso@lw.com; jeffrey.mispagel@lw.com

**Federal Express and Email**
*(Counsel to the administrative agent under the DIP ABL FILO Facility*)
Sandy Qusba, Daniel L. Biller, and Jamie Fell
SIMPSON THACHER & BARTLETT LLP,
425 Lexington Ave.
New York, NY 10017
squsba@stblaw.com; daniel.biller@stblaw.com;
jamie.fell@stblaw.com

**Federal Express and Email**
*(Counsel to the Ad Hoc Group of Crossover Lenders*)
Mark Shinderman, Brett Goldblatt, Daniel B. Denny, and
Jordan A. Weber
MILBANK LLP
2029 Century Park East
Los Angeles, CA 90067
mshinderman@milbank.com; bgoldblatt@milbank.com;
ddenny@milbank.com; jweber@milbank.com

**Federal Express and Email**
*(Counsel to the Ad Hoc FILO Term Lender Group*)
Andrew N. Rosenberg, Jacob Adlerstein,
Douglas R. Keeton and Janick Gordils
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
arosenberg@paulweiss.com; jadlerstein@paulweiss.com;
dkeeton@paulweiss.com; jgordils@paulweiss.com

**Hand Delivery and Email**
*(Co-counsel to the Debtors*)
Michael Nestor, Kara Hammond Coyle, and Joseph M. Mulvihill
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 N. King Street
Wilmington, DE  19801
mnestor@ycst.com; kcoyle@ycst.com; jmulvihill@ycst.com

**Hand Delivery and Email**
Jane Leamy
The Office of the United States Trustee for the District of Delaware
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE  19801
jane.m.leamy@usdoj.gov

**Federal Express and Email**
*(Counsel to the Administrative Agent under the DIP Term Facility*)
Erin E. Trigg and Samuel S. Kohn
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, NY  10019
trigg.erin@dorsey.com; kohn.sam@dorsey.com

**Hand Delivery and Email**
*(Counsel to the Ad Hoc Group of Crossover Lenders*)
Robert J. Dehney
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
rdehney@mnat.com

**Hand Delivery and Email**
*(Counsel to the Ad Hoc FILO Term Lender Group*)
Richard S. Cobb
LANDIS RATH & COBB LLP
919 Market Street, Suite 1800
Wilmington, DE 19801
cobb@lrclaw.com

**Federal Express and Email**
*(Counsel to the Committee)*
Michael S. Etkin, Michael Savetsky, Nicole Fulfree and Colleen M. Maker
LOWENSTEIN SANDLER LLP
One Lowenstein Drive
Roseland, NJ  070686
metkin@lowenstein.com; msavetsky@lowenstein.com;
nfulfree@lowenstein.com; cmaker@lowenstein.com

**Hand Delivery and Email**
*(Counsel to the Committee)*
Scott D. Cousins
BAYARD, P.A.
600 North King Street
Suite 400
Wilmington, DE 19801
scousins@bayardlaw.com

**Federal Express and Email**
*(Counsel to the Committee)*
Jeffrey Cohen, Lindsay H. Sklar
LOWENSTEIN SANDLER LLP
1251 Avenue of the Americas
New York, NY  10020
jcohen@lowenstein.com; lsklar@lowenstein.com